**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**BALTIMORE DIVISION**

MAYOR AND CITY COUNCIL OF BALTIMORE
City Hall
100 North Holliday Street
Baltimore, MD 21202,

        Plaintiff,

        v.

MONSANTO COMPANY
c/o Corporation Service Company
251 Little Falls Drive                CASE NO.: _____
Wilmington, DE  19808;

SOLUTIA INC.
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE  19808; and

PHARMACIA CORPORATION
c/o The Corporation Trust Company
1209 Orange Street
Wilmington, DE  19801,

        Defendants.

_____

**COMPLAINT**

**TABLE OF CONTENTS**

I.     NATURE OF THE ACTION ...........................................................................1

II.    PARTIES ........................................................................................................3

III.   JURISDICTION AND VENUE .....................................................................6

IV.   FACTUAL ALLEGATIONS ..........................................................................6

     A.     PCBs are Toxic Chemicals that Cause Environmental Contamination...................6

     B.     Monsanto Has Long Known of PCBs' Toxicity. .....................................9

     D.     Monsanto Concealed the Nature of PCBs from Governmental Entities. ..............19

     E.     Maryland and Baltimore Waters are "Impaired" Due to PCB Contamination .......................................................................................21

FIRST CAUSE OF ACTION: PUBLIC NUISANCE ..................................................23

SECOND CAUSE OF ACTION: STRICT LIABILITY- DEFECTIVE DESIGN AND MANUFACTURE ...........................................................................................26

THIRD CAUSE OF ACTION: STRICT LIABILITY- FAILURE TO WARN ...........................28

FOURTH CAUSE OF ACTION: TRESPASS ............................................................30

FIFTH CAUSE OF ACTION: NEGLIGENCE ...........................................................31

PRAYER FOR RELIEF .....................................................................................32

DEMAND FOR JURY TRIAL .............................................................................33

## I.     NATURE OF THE ACTION

1.     Polychlorinated biphenyls (or "PCBs") are man-made chemical compounds that have become notorious as global environmental contaminants. PCBs are found in bays, oceans, rivers, streams, soil, and air. As a result, PCBs have been detected in the tissues of all living beings on earth including all forms of marine life, various animals and birds, plants and trees, and humans.

2.     The extent of environmental PCB contamination is troubling because PCBs cause a variety of adverse health effects. In humans, PCB exposure is associated with cancer as well as serious non-cancer health effects, including effects on the immune system, reproductive system, nervous system, endocrine system and other health effects. In addition, PCBs destroy populations of fish, birds, and other animal life.

3.     Monsanto Company was the sole manufacturer of PCBs in the United States from 1935 to 1977, and trademarked the name "Aroclor" for certain PCB compounds. Although Monsanto knew for decades that PCBs were toxic and knew that their ordinary and intended uses would result in widespread contamination of natural resources and living organisms, Monsanto concealed these facts and continued producing PCBs until Congress enacted the Toxic Substances Control Act ("TSCA"), which banned the manufacture and most uses of PCBs as of January 1, 1979.

4.     PCBs were used in many industrial and commercial applications, including paint, caulking, transformers, capacitors, coolants, hydraulic fluids, plasticizers, sealants, inks, lubricants, among other uses. PCBs regularly leach, leak, off-gas, and escape their intended applications, contaminating runoff during naturally occurring storms and other rain events.

5.     As a result, PCBs contaminate the streets, the drainage systems, stormwater, and water bodies within the boundaries of Baltimore. This contamination, together with costs incurred

1

or to be incurred in investigating, analyzing, monitoring, and remediating such contamination, constitutes injury to Plaintiff.

6.      The Mayor and City Council of Baltimore, in its governmental capacity, owns and operates a municipal separate stormwater system ("MS4") that captures precipitation that falls on impervious surfaces such as streets, sidewalks, and roofs.  The stormwater system includes, among other things, gutters, inlets, pipes, outfalls, catch basins, and other stormwater infrastructure and features.

7.      According to State water quality data from 2016, around 921 square miles of Maryland's estuarine waters are "impaired" by PCB contamination. In addition, approximately 223 miles of Maryland's rivers and streams, and approximately 3,150 acres of Maryland's lakes and reservoirs, are similarly impaired.

8.      PCB-impaired waters in Maryland—that is, waters with PCB concentrations in excess of levels determined to be safe for human beneficial uses—include, among many others, Baltimore Harbor, the Patapsco River, Lake Roland, and the Back River.

9.      Baltimore Harbor is an economic engine for the City and the greater Baltimore region. As one recent report indicates, "the sediments beneath [the Harbor's] waters remain toxic—not only with the residue of past industrial activities, but also nutrient and sediment runoff from city streets and parks."

10.     The report also noted, "PCBs … appear[] in extremely high concentrations in the Inner Harbor, which may reflect the influence of stormwater runoff carried to the harbor from Jones Falls."

11.     This is consistent with a December 2012 joint EPA and U.S. Geological Survey report on PCB contamination in the Chesapeake Bay and surrounding waters, which found "severe" PCB contamination in certain "hot spots" around the Bay, including Baltimore Harbor.

12.     The available data strongly suggest that Baltimore City's stormwater system and Maryland waters surrounding and adjacent to Baltimore, including Lake Roland and Baltimore Harbor, are substantially impaired by PCBs.

13.     By this action, Plaintiff asserts claims for public nuisance, strict liability (design defect and failure to warn), and negligence, against Defendants to redress the widespread contamination of the City's stormwater and other water systems or bodies within the boundaries of Baltimore caused by Defendants' wrongful conduct in connection with the design, manufacture, marketing, sale, and distribution of PCBs.

14.     Plaintiff brings this action solely in its governmental capacity.  All claims asserted in this action are premised on Plaintiff's legislative responsibility for the maintenance and operation of municipal stormwater and other water systems and waterbodies, and are brought solely for the public benefit.  This action as a whole, and each claim separately, tends to benefit the public health and promote the welfare of the whole public, lacking any profit or emolument inuring to Plaintiff as proprietor.  Any such profit or emolument that may otherwise inure, as a result of this lawsuit, to Plaintiff as a proprietor is hereby disavowed.

15.     Plaintiff seeks all damages, including punitive or exemplary damages, to which it is entitled as a result of Defendants' conduct, as well as declaratory and injunctive relief, as set forth below.

Plaintiff MAYOR AND CITY COUNCIL OF BALTIMORE hereby alleges, upon information and belief, in part, as follows:

## II.     PARTIES

16.     The MAYOR AND CITY COUNCIL OF BALTIMORE ("the City," or "Plaintiff") is a municipal corporation, duly organized and existing by virtue of the laws of the State of Maryland.

17.    In order to discharge stormwater from the MS4, the City is subject to a Phase I Municipal Separate Storm Sewer Permit issued by the State of Maryland, Department of the Environment, pursuant to the National Pollutant Discharge Elimination System under the Clean Water Act.

18.    Discharges from the City's other systems, including its sewage system and potable water system, are also governed by National Pollutant Discharge Elimination System ("NPDES") permits.

19.    The City has spent considerable funds on impervious surface restoration efforts, which provide qualitative stormwater benefits, and will begin to monitor PCB concentrations in its stormwater discharges, which will require a significant monetary commitment.  Once this study has been completed, the City will develop a strategy to address PCB discharges from its stormwater system.

20.    Fish and shellfish that reside in Lake Roland are contaminated with PCBs at levels that make them unfit for human consumption.  Such condition has impaired and damaged Lake Roland, a recreational resource owned and operated by the City.

21.    The City must retrofit its stormwater system in order to manage, remove, and reduce the presence of PCBs in its stormwater system and Lake Roland, among other waters.

22.    Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its principal place of business in St. Louis, Missouri.

23.    Defendant Solutia, Inc. ("Solutia") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri.

24.    Defendant Pharmacia, LLC (formerly known as "Pharmacia Corporation" and successor to the original Monsanto Company) is a Delaware LLC with its principal place of business in Peapack, New Jersey.  Pharmacia is now a wholly-owned subsidiary of Pfizer, Inc.

25.     The original Monsanto Company ("Old Monsanto") operated an agricultural products business, a pharmaceutical and nutrition business, and a chemical products business.  Old Monsanto began manufacturing PCBs in the 1930s and continued to manufacture commercial PCBs until the late 1970s.

26.     Through a series of transactions beginning in approximately 1997, Old Monsanto's businesses were spun off to form three separate corporations.  The corporation now known as Monsanto operates Old Monsanto's agricultural products business.  Old Monsanto's chemical products business is now operated by Solutia.  Old Monsanto's pharmaceuticals business is now operated by Pharmacia.

27.     Solutia was organized by Old Monsanto to own and operate its chemical manufacturing business.  Solutia assumed the operations, assets, and liabilities of Old Monsanto's chemicals business.

28.     Although Solutia assumed and agreed to indemnify Pharmacia (then known as Monsanto Company) for certain liabilities related to the chemicals business, Defendants have entered into agreements to share or apportion liabilities, and/or to indemnify one or more entity, for claims arising from Old Monsanto's chemical business --- including the manufacture and sale of PCBs.

29.     In 2003, Solutia filed a voluntary petition for reorganization under Chapter 11 of the U.S. Bankruptcy Code.  Solutia's reorganization was completed in 2008.  In connection with Solutia's Plan of Reorganization, Solutia, Pharmacia and New Monsanto entered into several agreements under which Monsanto continues to manage and assume financial responsibility for certain tort litigation and environmental remediation related to the Chemicals Business.

30.     Monsanto, Solutia, and Pharmacia are collectively referred to in this Complaint as "Defendants."

## III.   JURISDICTION AND VENUE

31.   This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because complete diversity exists between Plaintiff and Defendants.  The Plaintiff is located in Maryland, but no Defendant is a citizen of Maryland.  Monsanto is a Delaware corporation with its principal place of business in St. Louis, Missouri.  Solutia is a Delaware corporation with its principal place of business in St. Louis, Missouri.  Pharmacia is a Delaware limited liability company with its principal place of business in Peapack, New Jersey.

32.   Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391(a) because all of the property that is the subject of the action is situated in this judicial district.

## IV.   FACTUAL ALLEGATIONS

### A.   PCBs are Toxic Chemicals that Cause Environmental Contamination.

33.   Polychlorinated biphenyl, or "PCB," is a molecule comprised of chlorine atoms attached to a double carbon-hydrogen ring (a "biphenyl" ring).  A "PCB congener" is any single, unique chemical compound in the PCB category.  Over two hundred congeners have been identified.

34.   PCBs were generally manufactured as mixtures of congeners.  From approximately 1935 to 1977, Monsanto Company was the only manufacturer in the United States that intentionally produced PCBs for commercial use.  The most common trade name for PCBs in the United States was "Aroclor," which was trademarked by Old Monsanto.

35.   Monsanto's commercially-produced PCBs were used in a wide range of industrial applications in the United States including electrical equipment such as transformers, motor start capacitors, and lighting ballasts.  In addition, PCBs were incorporated into a variety of products such as caulks, paints, and sealants.

36.     As used in this Complaint, the terms "PCB," "PCBs," "PCB-containing products," and "PCB products" refer to products containing polychlorinated biphenyl congener(s) manufactured for placement into trade or commerce, including any product that forms a component part of or that is subsequently incorporated into another product.

37.     PCBs easily migrate out of their original source material or enclosure and contaminate nearby surfaces, air, water, soil, and other materials.  For example, PCB compounds volatilize out of building materials (such as caulk) into surrounding materials such as masonry, wood, drywall, and soil, thereby causing damage to those surrounding materials and entering the natural environment.  PCBs can also escape from totally-enclosed materials (such as light ballasts) and similarly contaminate and damage surrounding materials, leading to their introduction into the natural environment.

38.     PCBs present serious risks to the health of humans, wildlife, and the environment.

39.     Humans may be exposed to PCBs through ingestion, inhalation, and dermal contact.  Individuals may inhale PCBs that are emitted into the air.  They may also ingest PCBs that are emitted into air and settle onto surfaces that come into contact with food or drinks.  And they may absorb PCBs from physical contact with PCBs or PCB-containing materials.

40.     EPA has determined that Monsanto's PCBs are probable human carcinogens.  In 1996, EPA reassessed PCB carcinogenicity, based on data related to Aroclors 1016, 1242, 1254, and 1260.  EPA's cancer reassessment was peer reviewed by 15 experts on PCBs, including scientists from government, academia and industry, all of whom agreed that PCBs are probable human carcinogens.

41.     The International Agency for Research on Cancer published an assessment in 2015 that asserts an even stronger relationship between PCBs and human cancer.  The report explains: "There is sufficient evidence in humans for the carcinogenicity of polychlorinated biphenyls

(PCBs). PCBs cause malignant melanoma. Positive associations have been observed for non-Hodgkin's lymphoma and cancer of the breast. ... PCBs are carcinogenic to humans ... ."

42.     In addition, EPA concluded that PCBs are associated with serious non-cancer health effects.  From extensive studies of animals and primates using environmentally relevant doses, EPA has found evidence that PCBs exert significant toxic effects, including effects on the immune system, the reproductive system, the nervous system, and the endocrine system.

43.     PCBs affect the immune system by causing a significant decrease in the size of the thymus gland, lowered immune response, and decreased resistance to viruses and other infections. The animal studies were not able to identify a level of PCB exposure that did not affect the immune system.  Human studies confirmed immune system suppression.

44.     Studies of reproductive effects in human populations exposed to PCBs show decreased birth weight and a significant decrease in gestational age with increasing exposures to PCBs.  Animal studies have shown that PCB exposures reduce birth weight, conception rates, live birth rates, and reduced sperm counts.

45.     Human and animal studies confirm that PCB exposure causes persistent and significant deficits in neurological development, affecting visual recognition, short-term memory, and learning. Some of these studies were conducted using the types of PCBs most commonly found in human breast milk.

46.     PCBs may also disrupt the normal function of the endocrine system.  PCBs have been shown to affect thyroid hormone levels in both animals and humans.  In animals, decreased thyroid hormone levels have resulted in developmental deficits, including deficits in hearing.  PCB exposures have also been associated with changes in thyroid hormone levels in infants in studies conducted in the Netherlands and Japan.

47.     PCBs have been associated with other health effects including elevated blood pressure, serum triglyceride, and serum cholesterol in humans; dermal and ocular effects in monkeys and humans; and liver toxicity in rodents.

48.     Children may be affected to a greater extent than adults.  The Agency for Toxic Substances and Disease Registry explained:  "Younger children may be particularly vulnerable to PCBs because, compared to adults, they are growing more rapidly and generally have lower and distinct profiles of biotransformation enzymes, as well as much smaller fat deposits for sequestering the lipophilic PCBs."

49.     PCBs are known to be toxic to a number of aquatic species and wildlife including fish, marine mammals, reptiles, amphibians, and birds.  Exposure is associated with death, compromised immune system function, adverse effects on reproduction, development, and endocrine function.  PCB exposure affects liver function, the digestive system, and nervous systems and can promote cancer in a number of animal species.  The presence of PCBs can cause changes in community and ecosystem structure and function.

        **B.**     Monsanto Has Long Known of PCBs' Toxicity.

50.     Monsanto was well aware of scientific literature published in the 1930s that established that inhalation in industrial settings resulted in toxic systemic effects.

51.     An October 11, 1937, Monsanto memorandum advises that "Experimental work in animals shows that prolonged exposure to Aroclor vapors evolved at high temperatures or by repeated oral ingestion will lead to **systemic toxic effects**.  Repeated bodily contact with the liquid Aroclors may lead to an acne-form skin eruption."[1]

52.     A September 20, 1955, memo from Emmet Kelly, Monsanto's Medical Director, set out Monsanto's position with respect to PCB toxicity:  "**We know Aroclors are toxic,** but the

---

[1] Exhibit 1 (MONS 061332).

actual limit has not been precisely defined.  It does not make too much difference, it seems to me, because our main worry is what will happen if an individual develop[s] any type of liver disease and gives a history of Aroclor exposure.  I am sure the juries would not pay a great deal of attention to [maximum allowable concentrates]."[2]

53.     On November 14, 1955, Monsanto's Medical Department provided an opinion that workers should not be allowed to eat lunch in the Aroclor department:

> It has long been the opinion of the Medical Department that eating in process departments is a potentially hazardous procedure that could lead to serious difficulties.  While the Aroclors are not particularly hazardous from our own experience, this is a difficult problem to define because early literature work claimed that chlorinated biphenyls were quite toxic materials by ingestion or inhalation.[3]

54.     On January 21, 1957, Emmet Kelly reported that after conducting its own tests, the U.S. Navy decided against using Monsanto's Aroclors:   "No matter how we discussed the situation, it was impossible to change their thinking that Pydraul 150 is just **too toxic** for use in a submarine."[4]

55.     In 1966, Kelly reviewed a presentation by Swedish researcher Soren Jensen, who stated that PCBs "appeared to be the **most injurious** chlorinated compounds of all tested."[5]  Jensen refers to a 1939 study associating PCBs with the deaths of three young workers and concluding that "pregnant women and persons who have at any time had any liver disease are particularly

---

[2] Exhibit 2 (MONS 095196).

[3] Exhibit 3 (no Bates number).

[4] Exhibit 4 (MONS 095640).

[5] Exhibit 5 (JDGFOX00000037).

susceptible."[6]  Kelly does not dispute any of Jensen's remarks, noting only, "As far as the section on toxicology is concerned, it is true that chloracne and liver trouble can result from large doses."[7]

56.    On January 29, 1970, Elmer Wheeler of the Monsanto Medical Department circulated laboratory reports discussing results of animal studies.  He noted:  "Our interpretation is that the PCB's are exhibiting a greater degree of toxicity in this chronic study than we had anticipated.  Secondly, although there are variations depending on species of animals, **the PCB's are about the same as DDT in mammals**."[8]

### C.    Monsanto Has Long Known that PCBs Were "Global Contaminants" Causing Harm to Animals and Fish.

57.    Monsanto became aware that PCBs were causing widespread contamination of the environment, far beyond the areas of its immediate use, during the time period in which it was producing and selling PCBs.

58.    In 1966, *New Scientist* published a note titled, "Report of a New Chemical Hazard," indicating that "[a] Swedish research worker has expressed concern over the increased amounts of polychlorinated biphenyl (PCB) entering the air, presumably from industrial smoke and rubbish-dump smoke, and being absorbed by water and taken up by fish and later humans."  The note also states that PCBs are "related to and as poisonous as DDT," and summarizes then-ongoing research by Dr. Jensen showing PCB concentrations detected in pike, fish and fish-spawn, eagles, and his own, and his family's, hair.  The note further states that "PCB is much harder to break down than DDT and there is every reason to suppose that it is much more difficult to get it out of the system,"

---

[6] *Id*. at JDGFOX00000039.

[7] *Id*. at JDGFOX00000037.

[8] Exhibit 6 (MONS 098480).

observing that PCBs have been "detected in the air over London and Hamburg and also in seals caught off Scotland.  It can therefore be presumed to be widespread throughout the world."[9]

59.     Monsanto—which also manufactured DDT for decades—knew that PCBs shared many chemical, toxicological, and environmental properties with DDT.  Monsanto knew DDT posed grave environmental risks and threatened the public health as well as the health of wildlife, aquatic life, and the natural environmental more generally.

60.     By the late 1940s, scientific researchers had established that DDT and other chlorinated hydrocarbons (a class of chemicals to which PCBs also belong) are absorbed and stored in fatty tissue of living organisms exposed to them, and pass these contaminants on to their offspring in milk.  For instance, the *American Journal of Public Health* published a 1950 report warning that "chlorinated hydrocarbons, such as DDT and chlordane, are soluble in fats and are stored in the fatty tissues of the body.  These compounds possess a high order of toxicity, and their uncontrolled or unwise use is not desirable."  Extensive scientific research establishing the toxicity and bioaccumulative and biopersistent nature of DDT and other chlorinated hydrocarbons was published from the 1940s to the 1960s.

61.     Following publication of the *New Scientist* report, Monsanto's Medical Director, Emmet Kelly, in 1966, obtained and reviewed the academic conference presentation by Dr. Jensen that apparently underlies the report.[10]   In the presentation, Jensen reported that the "main characteristic[s]" of PCBs are "[t]heir very high stability," their lack of "metaboliz[ation] in living organism[s]," and their non-flammability.[11]   The presentation also reports the detection of PCBs

---

[9] Exhibit 7 (773987).

[10] Exhibit 5.

[11] *Id.* at -38.

in the tissues of fish and wildlife in Sweden and indicates that the source is likely from industrial uses of PCBs rather than agriculture.[12]

62.     A December 1968 article by Professor Richard Risebrough identified chlorinated hydrocarbons (which include PCBs) as "the most abundant synthetic pollutants present in the global environment." The article reported finding significant concentrations of PCBs in the bodies and eggs of peregrine falcons and 34 other bird species. The report linked PCBs to the rapid decline in peregrine falcon populations in the United States.

63.     On March 6, 1969, Monsanto employee W. R. Richard wrote a memorandum summarizing Risebrough's article cited above, as concluding that PCBs are "toxic substance[s]," "widely spread by air-water; therefore, an uncontrollable pollutant . . . causing extinction of peregrine falcon … [and] endangering man himself."[13]  Richard explained that Monsanto could take steps to reduce PCB releases from its own plants but cautioned, "It will be still more difficult to control other end uses such as cutting oils, adhesives, plastics, and NCR paper. In these applications exposure to consumers is greater and the disposal problem becomes complex."[14]

64.     On September 9, 1969, Richard wrote an interoffice memo titled "Defense of Aroclor."[15]  He acknowledged the role of Aroclor in water pollution:  "Aroclor product is refractive, will settle out on solids – sewerage sludge – river bottoms, and apparently has a long life." He noted that Aroclors 1254 and 1260 had been found along the Gulf Coast of Florida causing a problem with shrimp; in San Francisco Bay, where it was reported to thin egg shells in birds; and in the Great Lakes. Richard advised that the company could not defend against all

---

[12] *Id.* at -46.

[13] Exhibit 8 (MONS 096509).

[14] *Id*.

[15] Exhibit 9 (DSW 014256).

criticism but should limit Aroclor uses and immediately engage in remediation measures:  "We can't defend vs. everything.  Some animals or fish or insects will be harmed.  Aroclor degradation rate will be slow.  Tough to defend against.  Higher chlorination compounds will be worse [than] lower chlorine compounds.  Therefore, we will have to restrict uses and clean-up as much as we can, starting immediately."[16]

65.     The Aroclor Ad Hoc Committee held its first meeting on September 5, 1969.  The committee's objectives were to continue sales and profits of Aroclors in light of the fact that PCB "may be a **global contaminant**."[17]  The meeting minutes acknowledge that PCB had been found in fish, oysters, shrimp, birds, along coastlines of industrialized areas such as Great Britain, Sweden, Rhine River, low countries, Lake Michigan, Pensacola Bay, and in Western wildlife. Moreover, the committee implicated the normal use of PCB-containing products as the cause of the problem:  "In one application alone (highway paints), one million lbs/year are used.  **Through abrasion and leaching we can assume that nearly all of this Aroclor winds up in the environment**."[18]

66.     A month later, on October 2, 1969, the Ad Hoc Committee reported extensive environmental contamination.  The U.S. Department of Interior, Fish and Wildlife found PCB residues in dead eagles and marine birds.  Similarly, the Bureau of Commercial Fisheries reported finding PCBs in the river below Monsanto's Pensacola plant.   The U.S. Food and Drug Administration had discovered PCBs in milk supplies.  The Committee advised that Monsanto could not protect the environment from Aroclors as "global" contaminants, but could protect the continued manufacture and sale of Aroclors:

---

[16] *Id.*

[17] Exhibit 10 (MONS 030483).

[18] *Id.* at -85.

There is little probability that any action that can be taken will prevent the growing incrimination of specific polychlorinated biphenyls (the higher chlorinated – e.g. Aroclors 1254 and 1260) as nearly <u>global environmental contaminants</u> leading to <u>contamination of human food</u> (particularly fish), the <u>killing of some marine species</u> (shrimp), and the possible extinction of several species of fish eating birds.

Secondly, the committee believes that there is no practical course of action that can so effectively police the uses of these products as to prevent environmental contamination.  <u>There are, however a number of actions</u> which must be undertaken <u>to prolong the manufacture, sale and use of these particular Aroclors</u> as well as to protect the continued use of other members of the Aroclor series.[19]

64.     Despite growing evidence of PCBs' infiltration of every level of the global ecology, Monsanto remained steadfast in its production and marketing of Aroclors and other PCBs.

65.     Monsanto expressed a desire to keep profiting from PCBs despite the environmental consequences in a PCB Presentation to its Corporate Development Committee.  The Presentation suggests possible reactions to the contamination issue.  It considered that doing nothing was "unacceptable from a legal, moral, and customer public relations and company policy viewpoint."  But the option of going out of the Aroclor business was also considered unacceptable: "there is too much customer/market need and selfishly **too much Monsanto profit to go out**."[20]

66.     Monsanto's desire to protect Aroclor sales rather than the environment is reflected in the Ad Hoc Committee's stated objectives:

1.      Protect **continued sales and profits** of Aroclors;
2.      Permit **continued development of new uses and sales**, and
3.      **Protect the image** of the Organic Division and the Corporation as members of the business community recognizing their responsibilities to prevent and/or control contamination of the global ecosystem.[21]

---

[19] Exhibit 11 (DSW 014612), at -15.

[20] Exhibit 12 (MONS 058730), at -37.

[21] *Id.*

67.    An interoffice memorandum circulated on February 16, 1970, provided talking points for discussions with customers in response to Monsanto's decision to eliminate Aroclors 1254 and 1260:  "We (your customer and Monsanto) are not interested in using a product which may present a problem to our environment."  Nevertheless, the memo acknowledges that Monsanto "**can't afford to lose one dollar of business**."  To that end, it says, "We want to avoid any situation where a customer wants to return fluid. . . . We would prefer that the customer use up his current inventory and purchase [new products] when available.  He will then top off with the new fluid and eventually all Aroclor 1254 and Aroclor 1260 will be out of his system.  We don't want to take fluid back." [22]

68.    Even worse, Monsanto instructed its customers to dispose of PCB containing material in local landfills, knowing that landfills were not suitable for PCB contaminated waste. Monsanto had determined that the only effective method of disposing of PCBs was incineration, and it constructed an incinerator for disposal of its own PCB contaminants.  Nevertheless, as Monsanto's Manager of Environmental Control, William Papageorge, explained in his 1975 testimony before the Wisconsin Department of Natural Resources, Monsanto instructed its customers to dispose of PCB contaminated waste in landfills: "lacking that resource [a commercial incinerator], we have to reluctantly suggest, because we don't have a better answer, that they find a well operated, properly operated landfill and dispose of the material in that fashion." [23]

---

[22] Exhibit 13 (MONS 100123).

[23] *See* Testimony of William Papageorge, Public Hearing to Review and Receive Public Comment Upon Proposed Administrative Rules Relating to the Discharge of Polychlorinated Biphenyls (PCB's) Into the Waters of the State, Before the Department of Natural Resources (August 28-29, 1975).

69.    In 1970, the year after Monsanto formed the Ad Hoc Committee, and despite Monsanto's actual knowledge of the global reach of PCB contamination, PCB production in the United States peaked at 85 million pounds.

70.    Growing awareness of the ubiquitous nature of PCBs led the United States to conduct an investigation of health and environmental effects and contamination of food and other products.   An interdepartmental task force concluded in May 1972 that PCBs were highly persistent, could bioaccumulate to relatively high levels, and could have serious adverse health effects on human health.

71.    After the 1972 report, the EPA undertook a study to assess PCB levels in the environment on a national basis.  Culminating in a 1976 report, the EPA study revealed widespread occurrence of PCBs in bottom sediments in several states; in fish and birds; in lakes and rivers; in the Atlantic Ocean, the Pacific Ocean, and the Gulf of Mexico; sewage treatment facilities; in a variety of foods including milk, poultry, eggs, fish, meat, and grains; and in human tissues, blood, hair, and milk.  The EPA concluded, PCBs were a "more serious and continuing environmental and health threat than had been originally realized."

72.    Meanwhile, up until at least 1970, Monsanto was aggressively promoting the expanded use and sale of Aroclor and other PCB compounds, including in consumer products.  In a 1960 brochure, Monsanto promoted the use of Aroclors in transformers and capacitors, utility transmission lines, home appliances, electric motors, fluorescent light ballasts, wire or cable coatings, impregnants for insulation, dielectric sealants, chemical processing vessels, food cookers, potato chip fryers, drying ovens, thermostats, furnaces, and vacuum diffusion pumps. Aroclors could also be used, the brochure advertised, as a component of automotive transmission oil; insecticides; natural waxes used in dental casting, aircraft parts, and jewelry; abrasives; specialized lubricants; industrial cutting oils; adhesives; moisture-proof coatings; printing inks;

papers; mastics; sealant; caulking compounds; tack coatings; plasticizers; resin; asphalt; paints, varnishes, and lacquers; masonry coatings for swimming pools, stucco homes, and highway paints; protective and decorative coatings for steel structures, railway tank and gondola cars; wood and metal maritime equipment;  and coatings for chemical plants, boats, and highway marking.[24]

73.    A 1961 brochure touted that Monsanto's Aroclors were being used in "lacquers for women's shoes,"   as "a wax for the flame proofing of Christmas trees," as "floor wax," as an adhesive for bookbinding, leather, and shoes, and as invisible marking ink used to make chenille rugs and spreads. [25]

74.    Thus, by February 1961, at the latest, Monsanto possessed actual knowledge that its Aroclors were being used in a variety of industrial, commercial, household, and consumer goods, and affirmatively promoted these uses by encouraging salesmen to market products for these and other applications.

75.    A few years later, in 1970, Monsanto began to distance itself from the variety of applications of Aroclors that it had proudly espoused a few years before.  In a press release, the company claimed:  "What should be emphasized . . . is that PCB was developed over 40 years ago primarily for use as a coolant in electrical transformers and capacitors.  It is also used in commercial heating and cooling systems.  It is not a 'household' item."[26]

76.    This message was repeated in a variety of public statements, including in a document published as "Monsanto Statement on PCBs" in the journal *Environment* in 1970.  In that publication, Monsanto states that PCBs are not used in "household products" and are not "highly toxic," despite actual knowledge that PCBs were, in fact, used in household products and

---

[24] Exhibit 14 (LEXOLDMON004616).

[25] Exhibit 15 (0627503).

[26] Exhibit 16 (MCL000647).

were highly toxic.   The publication also falsely implies that PCBs do not represent an environmental hazard because a "principal market" for PCBs is in closed electrical applications where PCBs are "completely sealed in metal containers," and because PCBs are used in polymers meant for applications as adhesives, elastomers, and surface coatings, rendering them incapable of escape, when, in fact, Monsanto knew that PCBs would inevitably escape their ordinary and intended uses to contaminate the natural environment.

> **D.**     Monsanto Concealed the Nature of PCBs from Governmental Entities.

77.     While the scientific community and Monsanto knew that PCBs were toxic and becoming a global contaminant, Monsanto repeatedly misrepresented these facts, telling the public and governmental entities the exact opposite — that the compounds were not toxic and that the company would <u>not</u> expect to find PCBs in the environment in a widespread manner.

78.     In a March 24, 1969 letter to the Los Angeles County Air Pollution Control District, Monsanto advised that the Aroclor compounds "are not particularly toxic by oral ingestion or skin absorption."[27]   Addressing reports of PCBs found along the West Coast, Monsanto claimed ignorance as to their origin, explaining that "very little [Aroclor] would normally be expected either in the air or in the liquid discharges from a using industry."[28]  A similar letter to the Regional Water Quality Control Board explained that PCBs are associated with "no special health problems" and "no problems associated with the environment."[29]

79.     In May 1969, Monsanto employee Elmer Wheeler, in Monsanto's Medical Department, spoke with a representative of the National Air Pollution Control Administration,

---

[27] Exhibit 17 (NCR-FOX-0575881).

[28] *Id*.

[29] Exhibit 18 (NEV 031051).

who promised to relay to Congress the message that Monsanto "cannot conceive how the PCBs can be getting into the environment in a widespread fashion."[30]

80.    Monsanto delivered the same message to the New Jersey Department of Conservation in July, 1969, claiming first, "Based on available data, manufacturing and use experience, we do not believe the [PCBs] to be seriously toxic."[31]   The letter then reiterates Monsanto's position regarding environmental contamination:  "[W]e are unable at this time to conceive of how the PCBs can become wide spread in the environment. It is certain that no applications to our knowledge have been made where the PCBs would be broadcast in the same fashion as the chlorinated hydrocarbon pesticides have been."[32]

81.    Behind the scenes, as reflected in an internal memorandum dated February 10, 1967, prepared by Monsanto Medical Director Emmet Kelly, Monsanto was "very worried" about the negative publicity the company would suffer as a result of media coverage of the PCB contamination issue.  The memo, which addresses the problem of "Aroclor in the air and in various fish and other living reservoirs," indicates: "We are very worried about what is liable to happen in the [United States] when the various technical and lay news media pick up the subject.  This is especially critical at this time because air pollution is getting a tremendous amount of publicity in the United States."[33]

82.    The memo continues: "We have been receiving quite a few communications from our customers, but the most critical one is NCR, who are very much involved with their carbonless copy paper. … The consensus in St. Louis is that while Monsanto would like to keep in the

---

[30] Exhibit 19 (NCR-FOX-0575888), at -89.

[31] Exhibit 20 (NCR-FOX-0575899).

[32] *Id*.

[33] Exhibit 21 (MONS 031358).

background in this problem, we don't see how we will be able to in the United States. We feel our customers, especially NCR, may ask us for some sort of data concerning the safety of these residues in humans. This obviously might be opening the door to an extensive and quite expensive toxicological/pharmacological investigation."[34]

83.     Despite receiving such inquiries from customers about PCB toxicity and environmental risks, Monsanto failed to provide truthful and adequate warnings or instructions concerning those risks, even to its direct customers. Indeed, as alleged above, Monsanto doubled down on its campaign of deception, issuing numerous public statements and statements to regulators denying the toxicity of PCBs and denying the environmental hazards Monsanto knew PCBs posed as a result of ordinary and intended uses.

84.     Monsanto had a complete and comprehensive record of all PCB-related scientific research and general reportage during the relevant time period. Indeed, in an August 6, 1971 internal memorandum, Elmer Wheeler admits that, "we have probably the world's best reference file on the PCB situation. This includes reprints from the literature beginning in 1936 to reports issued last week."[35]

### E.     Maryland and Baltimore Waters are "Impaired" Due to PCB Contamination

85.     As described above, PCBs enter the City's stormwater and wastewater systems through no fault of the City of Baltimore. The City then lawfully discharges wastewater and stormwater in accordance with its NDPES permits.

86.     As the State's fish consumption advisories demonstrate, fish from a host of rivers, creeks, harbors, reservoirs, lakes, and other waterbodies throughout the State, including Lake

---

[34] *Id.*

[35] Exhibit 22 (MONS 029656).

Roland have been shown to exhibit PCB contamination at levels higher than the impairment level specified by water quality standards.

87.     For example, Maryland PCB fish consumption advisories recommend restricted consumption of Striped Bass from the Patapsco River and Jones Falls, and warn that various fish from the Back River should be avoided altogether.

88.     Moreover, environmental research suggests that high concentrations of PCBs in local waters likely caused the declining size of the Baltimore Harbor heron colony.

89.     Baltimore has taken measures to reduce the volume of PCBs in its stormwater, including by implementing impervious surface restoration efforts, and will incur additional costs to test, monitor and remediate Monsanto's PCBs in the future.

# FIRST CAUSE OF ACTION
## PUBLIC NUISANCE

90.     Plaintiff realleges and reaffirms each and every allegation set forth in paragraphs 1-89 as if fully restated in this cause of action.

91.     Plaintiff brings this cause of action in its governmental capacity.  This claim is premised on Plaintiff's legislative responsibility for the maintenance and operation of municipal stormwater and other water systems and waterbodies, and is brought solely for the public benefit. This claim further tends to benefit the public health and promote the welfare of the whole public, lacking any profit or emolument inuring to Plaintiff as proprietor.

92.     Monsanto manufactured, distributed, marketed, and promoted PCBs in a manner that created or contributed to the creation of a public nuisance that is harmful to health and obstructs the free use of the City's stormwater and other water systems and waters.

93.     Monsanto intentionally manufactured, marketed, and sold PCBs with the knowledge that they caused global environmental contamination.

94.     Monsanto knew that PCBs would likely end up in the City's stormwater systems, waterways, water bodies, sediments, fish and animal tissues, when used as intended, including in Baltimore.

95.     Monsanto's conduct and the presence of PCBs annoys, injures, and endangers the comfort, repose, health, and safety of others.

96.     Monsanto's conduct and the presence of PCBs interferes with and obstructs the public's free use and comfortable enjoyment of the City's waters for commerce, navigation, fishing, recreation, and aesthetic enjoyment.

97.     The presence of PCBs also interferes with the free use of the City's stormwater system and waters for a healthy ecologically sound environment.

98.     Monsanto's conduct and the presence of PCBs in the City's stormwater system and waters is injurious to human, animal, and environmental health.

99.     An ordinary person would be reasonably annoyed or disturbed by the presence of toxic PCBs that endanger the health of fish, animals, and humans and degrade water quality and marine habitats.

100.    The seriousness of the environmental and human health risk far outweighs any social utility of Monsanto's conduct in manufacturing PCBs and concealing the dangers posed to human health and the environment.

101.    The rights, interests, and inconvenience to the City and general public far outweighs the rights, interests, and inconvenience to Monsanto, which profited heavily from the manufacture of PCBs and which can no longer produce PCBs.

102.    Monsanto's conduct caused and continues to cause harm to the City.

103.    The City has suffered and will continue to suffer damage from Monsanto's PCBs. The City incurs or will incur costs to remove PCBs that have invaded its drainage systems and to prevent additional PCBs from entering its systems.  Many of the City's streets are contaminated with PCBs that enter the City's drainage systems. The City suffers injuries that are different from those suffered by the public at large.

104.    The City has already incurred costs associated with impervious surface restoration efforts, and will incur additional costs to test, monitor and remediate Monsanto's PCBs in the future.

105.    Monsanto knew or, in the exercise of reasonable care, should have known that the manufacture and sale of PCBs causes the type of contamination now found in the City's stormwater system and waters.  Monsanto knew that PCBs would contaminate water supplies, degrade marine habitats and endanger birds and animals.  In addition, Monsanto knew PCBs are

associated with serious illnesses and cancers in humans and that humans may be exposed to PCBs through ingestion of fish and/or dermal contact. As a result, it was foreseeable to Monsanto that humans would be exposed to PCBs through swimming in contaminated waters, playing on contaminated beaches, and by eating fish and shellfish from contaminated areas. Monsanto thus knew, or should have known, that PCB contamination would seriously and unreasonably interfere with the ordinary comfort, use, and enjoyment of any contaminated water body, including the City's waters. Monsanto had a duty to cease manufacturing, distributing, selling and promoting PCBs and failed to do so. Monsanto also had a duty to warn about the dangers of PCBs and failed to do so.

106. Monsanto's conduct in manufacturing, distributing, selling and promoting PCBs constitutes an unreasonable interference with a right common to the general public, i.e., the right to freely use the City's stormwater system and waters without obstruction and health hazard.

107. Monsanto is under a continuing duty to act to correct and remediate the injuries its conduct has introduced, and to warn the City, its customers, and the public about the human and environmental risks posed by its PCBs, and each day on which it fails to do so constitutes a new injury to the City.

108. The City suffered harm of a kind different from that suffered by members of the general public, namely the costly damage to its stormwater system and waters which it constructs and/or maintains for the public welfare.

109. As a direct and proximate result of Monsanto's creation of a public nuisance, the City has suffered, and continues to suffer, monetary damages to be proven at trial.

## SECOND CAUSE OF ACTION
## STRICT LIABILITY- DEFECTIVE DESIGN AND MANUFACTURE

110.   Plaintiff realleges and reaffirms each and every allegation set forth in paragraphs 1-89 as if fully restated in this cause of action.

111.   Plaintiff brings this cause of action in its governmental capacity.  This claim is premised on Plaintiff's legislative responsibility for the maintenance and operation of municipal stormwater and other water systems and waterbodies, and is brought solely for the public benefit. This claim further tends to benefit the public health and promote the welfare of the whole public, lacking any profit or emolument inuring to Plaintiff as proprietor.

112.   Monsanto's PCBs were not reasonably safe as designed at the time the PCBs left Monsanto's control.

113.   PCBs' toxicity and inability to be contained rendered them unreasonably dangerous at all times.

114.   Monsanto's PCBs were unsafe as designed as demonstrated by the United States Congress banning the production and sale of PCBs pursuant to the Toxic Substances Control Act in 1979.

115.   Due to their toxicity and inability to be contained, Monsanto knew its PCBs were not safe at the time the product was manufactured because it knew that the product, even when used as intended, would become a global contaminant and cause toxic contamination of waterways and wildlife, such as the City's stormwater system, Lake Roland and the fish in Baltimore Harbor, due to the nature of PCBs.

116.   Monsanto knew its PCBs were unsafe to an extent beyond that which would be contemplated by an ordinary person because of the overwhelming seriousness of creating global contamination.

117.    Monsanto manufactured, distributed, sold, and promoted PCBs despite such knowledge in order to maximize its profits despite the known harm.

118.    At all times relevant to this action, feasible alternatives to PCBs were available to the defendants, which could have eliminated the unreasonable dangers and hazards posed by PCBs.

119.    Any utility allegedly provided by the use of PCBs is greatly outweighed by the risks and dangers associated with their use.

120.    The PCBs were placed in the stream of commerce and sold by Monsanto in a defective and unreasonably dangerous condition in that they were toxic, persistent, bioaccumulative, and volatile (i.e., inevitably escaping their ordinary and intended applications), which resulted in contamination of waterways, wildlife, and water systems, including within the City.

121.    The PCBs reached the City's waterways, wildlife, and water systems without any substantial change in condition and were in the same condition at the time of the alleged injury to the City's waterways, wildlife, and water systems.

122.    It was foreseeable to Monsanto or a reasonable manufacturer that the PCBs would reach the City's waterways, wildlife, and water systems.

123.    Contamination of the City's waterways, wildlife, and water systems occurred because of the defective design and manufacture of the PCBs.

124.    Monsanto's PCBs caused and continue to cause injury to the City.

125.    Monsanto is under a continuing duty to act to correct and remediate the injuries its conduct has introduced, and to warn the City, its customers, and the public about the human and environmental risks posed by its PCBs, and each day on which it fails to do so constitutes a new injury to the City.

126.    The City has suffered and will continue to suffer damages in amounts to be proven at trial.

**THIRD CAUSE OF ACTION**
**STRICT LIABILITY- FAILURE TO WARN**

127.    Plaintiff realleges and reaffirms each and every allegation set forth in paragraphs 1-89 as if fully restated in this count.

128.    Plaintiff brings this cause of action in its governmental capacity.  This claim is premised on Plaintiff's legislative responsibility for the maintenance and operation of municipal stormwater and other water systems and waterbodies, and is brought solely for the public benefit. This claim further tends to benefit the public health and promote the welfare of the whole public, lacking any profit or emolument inuring to Plaintiff as proprietor.

129.    Monsanto's PCBs were not reasonably safe because they lacked adequate warnings at the time the PCBs left Monsanto's control.

130.    At the time Monsanto manufactured, distributed, sold, and promoted its PCBs, Monsanto knew that PCBs, even when used as intended, would become a global contaminant and contaminate waterways and wildlife such as the City's stormwater,  Lake Roland and Baltimore Harbor.

131.    Despite Monsanto's knowledge, Monsanto failed to provide adequate warnings that its PCBs would become a global contaminant and contaminate waterways and wildlife, such as Baltimore's stormwater system, Lake Roland and Baltimore Harbor.

132.    Monsanto could have warned of this certainty but intentionally concealed the certainty of contamination in order to maximize profits.

133.    Monsanto learned and concealed the dangers of PCBs after it manufactured, distributed, promoted, and sold PCBs, and yet it did not issue warnings to those who had previously

28

purchased PCBs, and thereafter continued to manufacture, distribute, promote and sell PCBs without warnings.

134.    Without adequate warnings or instructions, Monsanto's PCBs were unsafe to an extent beyond that which would be contemplated by an ordinary person.

135.    Monsanto knowingly failed to issue warnings or instructions concerning the dangers of PCBs in the manner that a reasonably prudent manufacturer would act in the same or similar circumstances.

136.    The PCBs were placed in the stream of commerce and sold by Monsanto in a defective and unreasonably dangerous condition in that their design failed to include a warning necessary for the safe and proper use and disposal of the PCBs.

137.    The PCBs reached the City's waterways, wildlife, and water systems without any substantial change in condition and were in the same condition at the time of the alleged injury to the City's waterways, wildlife, and water systems.

138.    It was foreseeable that the PCBs would reach the City's waterways, wildlife, and water systems.

139.    Contamination of the City's waterways, wildlife, and water systems occurred because of the defective PCBs, in that to be non-defective and reasonably safe for use, the PCBs should have contained or been accompanied by a warning as to their toxicity, persistence, bioaccumulativity, and volatility.

140.    Further, such contamination occurred because of Monsanto's failure to adequately warn or instruct its customers as to proper disposal techniques, including that disposal in ordinary landfills is inappropriate and would lead to environmental contamination.

141.    Monsanto's PCBs caused and continue to cause injury to the City.

142.     Monsanto is under a continuing duty to act to correct and remediate the injuries its conduct has introduced, and to warn the City, its customers, and the public about the human and environmental risks posed by its PCBs, and each day on which it fails to do so constitutes a new injury to the City.

143.     The City has suffered and will continue to suffer damages in amounts to be proven at trial.

## FOURTH CAUSE OF ACTION
### TRESPASS

144.     Plaintiff realleges and reaffirms each and every allegation set forth in paragraphs 1-89 as if fully restated in this count.

145.     Plaintiff brings this cause of action in its governmental capacity.  This claim is premised on Plaintiff's legislative responsibility for the maintenance and operation of municipal stormwater and other water systems and waterbodies, and is brought solely for the public benefit. This claim further tends to benefit the public health and promote the welfare of the whole public, lacking any profit or emolument inuring to Plaintiff as proprietor.

146.     As alleged above, Monsanto manufactured, distributed, marketed, and promoted PCBs in a manner that ensured that its PCBs would invade the City's stormwater and other water systems and waterbodies.

147.     As a result of such invasion, the City's public water systems, which the City operates and maintains for the public welfare, suffer contamination with toxic PCBs.

148.     Such contamination is harmful to public health and obstructs the free use of the City's stormwater and other water systems and waters.

149.     Monsanto intentionally manufactured, marketed, and sold PCBs with the knowledge that they caused global environmental contamination.

150.    Monsanto knew that PCBs would likely end up in the City's stormwater systems, waterways, water bodies, sediments, fish and animal tissues, when used as intended, including in Baltimore.

151.    Monsanto's conduct caused and will continue to cause injury to the City.

152.    Monsanto is under a continuing duty to act to correct and remediate the injuries its conduct has introduced, and to warn the City, its customers, and the public about the human and environmental risks posed by its PCBs, and each day on which it fails to do so constitutes a new injury to the City.

153.    As a direct and proximate result of Monsanto's trespass, the City has suffered, and continues to suffer, monetary damages to be proven at trial.

## FIFTH CAUSE OF ACTION
### NEGLIGENCE

154.    Plaintiff realleges and reaffirms each and every allegation set forth in paragraphs 1-89 as if fully restated in this count.

155.    Plaintiff brings this cause of action in its governmental capacity.  This claim is premised on Plaintiff's legislative responsibility for the maintenance and operation of municipal stormwater and other water systems and waterbodies, and is brought solely for the public benefit. This claim further tends to benefit the public health and promote the welfare of the whole public, lacking any profit or emolument inuring to Plaintiff as proprietor.

156.    Monsanto had a duty of care to protect others against unreasonable risks resulting from the use or disposal of its PCBs.

157.    Monsanto breached its duty by failing to conform to the requisite standard of care when it negligently, carelessly, and recklessly designed, manufactured, formulated, handled, stored, labeled, instructed, controlled (or failed to control), tested (or failed to test), marketed, sold

and otherwise distributed toxic PCBs that contaminated the City's waterways, wildlife, and water systems..

158.     Monsanto failed to exercise ordinary care because a reasonably careful company that learned of its product's toxicity would not manufacture that product or would warn of its toxic properties.

159.     Monsanto failed to exercise ordinary care because a reasonably careful company that learned that its product could not be contained during normal production and use would not continue to manufacture that product or would warn of its dangers.

160.      Monsanto failed to exercise ordinary care because a reasonably careful company would not continue to manufacture PCBs in mass quantities and to the extent that Monsanto manufactured them.

161.     There is a proximate causal connection between Monsanto's breach of its duty of care and the resulting harm to the City's waterways, wildlife, and water systems.

162.     Monsanto's negligence caused and continues to cause injury to the City.

163.     Monsanto is under a continuing duty to act to correct and remediate the injuries its conduct has introduced, and to warn the City, its customers, and the public about the human and environmental risks posed by its PCBs, and each day on which it fails to do so constitutes a new injury to the City.

164.     The City has suffered and will continue to suffer damages in amounts to be proven at trial.

### **PRAYER FOR RELIEF**

Plaintiff prays for judgment against Defendants, jointly and severally, as follows:

1.     Damages according to proof;

2.      Punitive or exemplary damages sufficient to punish Defendants' use of fraudulent, malicious, or evil intent or actions and deter or warn others against commission of similar misconduct;

3.      Award of the present and future costs to abate the ongoing public nuisance and/or to investigate, assess, analyze, monitor, and remediate the contamination;

4.      Declaratory judgment and injunctive relief requiring Monsanto to pay for abatement of the ongoing nuisance;

5.      Litigation costs and attorney's fees as permitted by law;

6.      Pre-judgment and post-judgment interest;

7.      Any other and further relief as the Court deems just, proper, and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial.

Respectfully submitted,

**BALTIMORE CITY DEPARTMENT OF LAW**

Dated: February 19, 2019         /s/Andre M. Davis
                                       Andre M. Davis
                                       Baltimore City Solicitor (No. 00362)
                                       andre.davis@baltimorecity.gov
                                       Suzanne Sangree, Senior Public Safety Counsel
                                            and Director of Affirmative Litigation
                                            (No. 26130)
                                       suzanne.sangree2@baltimorecity.gov
                                       Elizabeth Ryan Martinez, Assistant Solicitor
                                       (No. 29394)
                                       liz.ryan@baltimorecity.gov
                                       100 N. Holliday Street, Suite 109
                                       Baltimore, MD 21202
                                       Tel.: (443) 388-2190
                                       Fax: (410) 576-7203

**BARON & BUDD, P.C.**
Scott Summy (*pro hac vice* to be filed)
John Fiske (*pro hac vice* to be filed)
11440 West Bernardo Court, Suite 265
San Diego, CA 92127
Tel.: (858) 251-7424
Fax: (214) 520-1181
ssummy@baronbudd.com
jfiske@baronbudd.com

**GRANT & EISENHOFER P.A.**
Jay W. Eisenhofer (*pro hac vice* to be filed)
Kyle J. McGee (*pro hac vice* to be filed)
123 S. Justison Street
Wilmington, DE 19801
Tel.: (302) 622-7000
Fax: (302) 622-7100
jeisenhofer@gelaw.com
kmcgee@gelaw.com

**GORDON, WOLF & CARNEY CHTD.**
Richard Gordon (No. 06882)
Martin Wolf (No. 09425)
100 W. Pennsylvania Avenue, Suite 100
Towson, MD 21204
Tel.: (410) 825-2300
Fax: (410) 825-0066
rgordon@GWCfirm.com
mwolf@GWCfirm.com

*Attorneys for Plaintiff*