# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**MAYOR AND CITY COUNCIL**
**OF BALTIMORE,**                              *

    **Plaintiff,**                         *

    **v.**                                *              **Civil Action No. RDB-19-0483**

**MONSANTO COMPANY, *et al.*,**                *

                          *

    **Defendants.**

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM OPINION

The Mayor and City Council of Baltimore ("the City") have filed a five-count Complaint against Monsanto Company ("Monsanto"), Solutia Inc., now operating Monsanto's chemical products business, and Pharmacia Corporation, now operating Monsanto's pharmaceuticals business. The City alleges contamination of its streets, drainage systems, storm water and water bodies with Polychlorinated Biphenyls ("PCBs"), chemical compounds used in industrial and commercial applications. The five Counts of the Complaint allege common law tort claims: public nuisance (Count I); strict product liability based on defective design and manufacture (Count II); strict product liability based on failure to warn (Count III); trespass (Count IV); and negligence (Count V). Presently pending is the Defendants' Motion to Dismiss the Complaint for lack of standing, pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, and for failure to state a claim, under Rule 12(b)(6). (ECF No. 29.) The parties' submissions have been reviewed, and no hearing is necessary. *See* Local Rule 105.6

(D. Md. 2018).  For the reasons that follow, the Motion to Dismiss (ECF No. 29) shall be DENIED.

**BACKGROUND**

In ruling on a motion to dismiss, this Court "accept[s] as true all well-pleaded facts in a complaint and construe[s] them in the light most favorable to the plaintiff." *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017) (citing *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015)).  The Court may consider only such sources outside the complaint that are, in effect, deemed to be part of the complaint, for example, documents incorporated into the complaint by reference and matters of which a court may take judicial notice.  *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007).

**I.      PCBs and Contamination**

PCBs are man-made chemical compounds that have been found to contaminate bays, oceans, rivers, streams, soil, and air.  (Compl. ¶ 1, ECF No. 1.)  As a result, PCBs have been detected in the tissues of all living beings, including marine life, animals and birds, plants and trees, and humans.  (*Id.*)  Exposure to PCBs can lead to various adverse health effects, including cancer, effects on the immune system, reproductive system, nervous system, endocrine system, and more.  (*Id.* ¶ 2.)

**A.  Monsanto and PCBs**

The City alleges that Monsanto was the sole manufacturer of PCBs in the United States from 1935 to 1977 and trademarked the name "Aroclor" for its PCB compounds.  (*Id.* ¶¶ 3, 25, 34.)  In its original form, Monsanto operated an agricultural products business, a pharmaceutical and nutrition business, and a chemical products business.  (*Id.* ¶ 25.)  Beginning

in approximately 1997, Monsanto's business reorganized to form three separate corporations: Monsanto, which still operates the agricultural products business; Solutia, which now operates Monsanto's chemical products business; and Pharmacia, which now operates Monsanto's pharmaceuticals business.  (*Id.* ¶ 26.)

Monsanto used PCBs in industrial and commercial applications, including electrical equipment such as transformers, motor start capacitors, and lighting ballasts, and other products such as caulks, paints, and sealants.  (*Id.* ¶ 35.)  PCBs regularly leach, leak, off-gas, and escape their intended applications, contaminating runoff during storms and other rain events, and resulting in the contamination of streets, drainage systems, stormwater, and water bodies.  (*Id.* ¶¶ 4, 5, 37.)  Humans are exposed to PCBs through ingestion, inhalation, and dermal contact.  (*Id.* ¶ 39.)  The Environmental Protection Agency ("EPA") has determined that PCBs are probable human carcinogens and that PCBs are associated with serious non-cancer health effects on the immune system, reproductive system, nervous system, and endocrine system.  (*Id.* ¶¶ 40-42.)  For example, human and animal studies have shown that PCB exposure leads to decreased birth weight, decrease in gestational age, reduced sperm counts, deficits in neurological development affecting visual recognition, short-term memory, and learning, and decreased thyroid hormone levels resulting in developmental deficits such as hearing.  (*Id.* ¶¶ 43-48.)  PCBs are also toxic to aquatic species and wildlife, with exposure resulting in death, compromised immune system function, adverse effects on reproduction, development, and endocrine functions.  (*Id.* ¶ 49.)  The presence of PCBs can also cause changes in community and ecosystem structure and function.  (*Id.*)

3

### B.  Monsanto's knowledge of PCB contamination

The City alleges that Monsanto has known for decades that PCBs are toxic and that their regular and intended uses would result in widespread contamination of the environment. (*Id.* ¶¶ 50-76.)   The City attaches as exhibits to its Complaint several internal Monsanto documents which are now public that reflect Monsanto's knowledge of the harmful effects of PCBs.  (*See* Compl. Exhibits 1-22, ECF Nos. 1-2 through 1-23.)   An October 11, 1937 Monsanto Memorandum notes that "[e]xperimental work in animals shows that prolonged exposure to Aroclor vapors…will lead to systemic toxic effects."  (Exhibit 1 at MONS 061332, ECF No. 1-2.)  Another 1955 memorandum from Monsanto's Medical Director states, "[w]e know Aroclors are toxic, but the actual limit has not been precisely defined."  (Exhibit 2 at MONS 095196, ECF No. 1-3.)  In 1966, Monsanto's Medical Director reviewed a medical presentation that reported the detection of PCBs in the tissues of fish and wildlife in Sweden and indicated that the likely source was from industrial uses of PCBs.  (Exhibit 5, ECF No. 1-6; Compl. ¶ 61, ECF No. 1.)

In 1969, Monsanto formed an Ad Hoc Committee on Aroclor, with the objective of continuing sales and profits of Aroclor in light of the fact that PCBs "may be a global contaminant."  (Exhibit 10 at MONS 030483, ECF No. 1-11.)   In meeting minutes, the Committee noted that "[t]hrough abrasion and leaching we can assume that nearly all of this Aroclor winds up in the environment." (*Id.* at MONS 030485.)  Despite the growing evidence of widespread contamination, it is alleged that Monsanto refused to stop production of Aroclor: "there is too much customer/market need and selfishly too much Monsanto profit

to go out." (Exhibit 12 at MONS 058730-37, ECF No. 1-13.) In 1970, PCB production in the United States peaked at 85 million pounds. (Compl. ¶ 69, ECF No. 1.)

The United States government conducted an investigation of PCBs in the early 1970s, resulting in a 1972 report that concluded that PCBs were highly persistent, could bioaccumulate to relatively high levels, and could have serious adverse health effects in humans. (*Id.* ¶ 70.) In 1976, after conducting a study to assess PCB levels in the environment on a national basis, the EPA revealed that PCBs were "a more serious and continuing environmental threat than had been originally realized." (*Id.* ¶ 71.)

### C. Monsanto's concealment of PCB contamination

The City alleges that Monsanto actively concealed the toxic nature of PCBs from governmental entities and the public, misrepresenting that the compounds were not toxic and that Monsanto did not expect to find PCBs in the environment in a widespread manner. (*Id.* ¶¶ 77-84.) In a 1969 letter to the Los Angeles County Air Pollution Control District, Monsanto explained that PCBs "are not particularly toxic by oral ingestion or skin absorption." (Exhibit 17 at NCR-FOX-0575881, ECF No. 1-18.) Also in 1969, a Monsanto employee spoke with a representative from the National Air Pollution Control Administration who promised to relay the message to Congress that Monsanto "cannot conceive how the PCBs can be getting into the environment in a widespread fashion." (Exhibit 19 at NCR-FOX-0575889, ECF No. 1-20; Compl. ¶ 79, ECF No. 1.) It is further alleged that similar messages were conveyed to the Regional Water Quality Control Board, the New Jersey Department of Conservation, as well as to inquiring customers. (Compl. ¶¶ 78, 80, 83.)

### D. Current national concern over PCB contamination

Many major municipalities across the nation have filed lawsuits against Monsanto in the wake of the environmental and health concerns over PCBs.  *See, e.g.*, *San Diego Unified Port District and City of San Diego v. Monsanto Co.*, No. 15-cv-578 (S.D. Cal.); *City of San Jose v. Monsanto Co.*, No. 5:15-cv-3178 (N.D. Cal.); *City of Oakland v. Monsanto Co.*, No. 5:15-cv-5152 (N.D. Cal.); *City of Spokane v. Monsanto Co.*, No. 2:15-cv-201 (E.D. Wash.); *City of Berkeley v. Monsanto Co.*, No. 5:16-cv-71 (N.D. Cal.); *City of Seattle v. Monsanto Co.*, No. 16-cv-107 (W.D. Wash.); *City of Long Beach v. Monsanto Co.*, No. 16-cv-3493 (C.D. Cal.); *City of Portland v. Monsanto Co.*, No. 3:16-cv-1418 (D. Or.); *Port of Portland v. Monsanto Co.*, No. 3:17-cv-15 (D. Or.); *City of Chula Vista v. Monsanto Co.*, No. 18-cv-1942 (S.D. Cal.).  In addition, several state attorneys general have asserted claims for injuries to natural resources as a result of Monsanto's conduct.  *See State of Washington v. Monsanto Co.*, No. 16-2-29591-6 (Wash. Super.); *State of Oregon v. Monsanto Co.*, No. 18CV00540 (Or. Super.); *State of Ohio v. Monsanto Co.*, No. A1801237 (Ohio Com. Pl.). Some of those actions remain pending, and Monsanto's efforts to have them be initially dismissed on motions has been unsuccessful.

## II.     Claims and Procedural History

Baltimore City alleges that such PCB contamination has also occurred within the boundaries of Baltimore.  (Compl. ¶¶ 5, 85-89, ECF No 1.)  The City, in its governmental capacity, owns and operates a municipal separate stormwater system ("MS4") that captures precipitation that falls on impervious surfaces such as streets, sidewalks, and roofs.  (*Id.* ¶ 6.) The stormwater system includes gutters, inlets, pipes, outfalls, catch basins, and other stormwater infrastructure and features.  (*Id.*)  To discharge water from the MS4 system, the City is subject to a Phase I Municipal Separate Storm Sewer Permit issued by the State of

Maryland, Department of the Environment, pursuant to the National Pollutant Discharge Elimination System ("NPDES") under the Clean Water Act. (*Id.* ¶ 17.) Discharge from the City's other systems, including its sewage and potable water systems, are also governed by NPDES permits. (*Id.* ¶ 18.)

According to the State of Maryland water quality data from 2016, approximately 921 square miles of Maryland's estuarine waters were "impaired" by PCB contamination with PCB levels in excess of levels determined to be safe for human beneficial uses, and approximately 223 miles of Maryland's rivers and streams and approximately 3,150 acres of Maryland's lakes and reservoirs are similarly impaired. (*Id.* ¶¶ 7, 8.) The PCB-contaminated waters in Maryland include Baltimore's Inner Harbor, the Patapsco River, Lake Roland, and the Back River. (*Id.* ¶¶ 8-12.)

The City asserts several negative consequences it has experienced because of PCB contamination in its waters. The State of Maryland's fish consumption advisories show that fish from rivers, creeks, harbors, reservoirs, lakes, and other waterbodies in Maryland, including Lake Roland in Baltimore City, have exhibited PCB contamination levels higher than the impairment level specified by water quality standards. (*Id.* ¶ 86.) These advisories also recommend restricted consumption of Striped Bass from the Patapsco River and Jones Falls and warn that certain fish from the Back River should be avoided completely. (*Id.* ¶ 87.) In addition, the City alleges that environmental research suggests that high concentrations of PCBs in local waters likely caused the declining size of the Baltimore Harbor heron colony. (*Id.* ¶ 88.)

On February 19, 2019, the City, bearing legislative responsibility for the maintenance and operation of municipal stormwater and other water systems and waterbodies, brought this action solely in its governmental capacity and solely for the public benefit.  (Compl. ¶ 14, ECF No. 1.)  The City asserts five causes of action against Defendants: public nuisance (Count I); strict product liability based on defective design and manufacture (Count II); strict product liability based on failure to warn (Count III); trespass (Count IV); and negligence (Count V).  (*Id.* ¶¶ 90-164.)  The City seeks all damages, including punitive or exemplary damages, to which it is entitled, in addition to declaratory and injunctive relief.  (*Id.* ¶ 15.)

On April 15, 2019, Defendants filed the presently pending Motion to Dismiss, which has been fully briefed.  (ECF Nos. 29, 50, 55.)  On September 12, 2019, the City filed a Notice of Supplemental Authority, providing notice of a decision issued by Judge Ellen L. Hollander of this Court on September 4, 2019 in *State of Maryland v. Exxon Mobil Corporation, et al.*, Civ. No. 18-0459-ELH, 2019 WL 4193422 (D. Md. Sept. 4, 2019).  (ECF No. 57.)  Defendants filed a response to the City's notice, requesting the Court disregard the notice and the *Exxon* decision, or, in the alternative, to allow supplemental briefing on the issue.  (ECF No. 58.)  The City replied that its notice of Judge Hollander's opinion was clearly relevant to the issues pending before this Court.  (ECF No. 59.)  Defendants again responded that the *Exxon* decision is distinguishable and requested the opportunity to submit supplemental briefing on this issue.  (ECF No. 60.)  As discussed below, Judge Hollander's decision in *Exxon* is clearly relevant and instructive to the issues before this Court, and no further briefing on this question is necessary.

## STANDARD OF REVIEW

### I.    Motion to Dismiss under Rule 12(b)(1)

A motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject-matter jurisdiction challenges a court's authority to hear the matter brought by a complaint. *See Davis v. Thompson*, 367 F. Supp. 2d 792, 799 (D. Md. 2005).  This jurisdictional attack may proceed either as a facial challenge, asserting that the allegations in the complaint are insufficient to establish subject-matter jurisdiction, or a factual challenge, asserting "that the jurisdictional allegations of the complaint [are] not true." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (citation omitted).

In a facial challenge, as asserted in this case, a court will grant a motion to dismiss for lack of subject-matter jurisdiction "where a claim fails to allege facts upon which the court may base jurisdiction." *Davis*, 367 F. Supp. 2d at 799.  In making this determination, "all the facts alleged in the complaint are assumed to be true and the plaintiff, in effect, is afforded the same procedural protection as he would receive under a 12(b)(6) consideration." *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982).[1]

### II.    Motion to Dismiss under Rule 12(b)(6)

Rule 8(a)(2) of the Federal Rules of Civil Procedure provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."

---

[1] Where the challenge is factual, "the district court is entitled to decide disputed issues of fact with respect to subject matter jurisdiction." *Kerns*, 585 F.3d at 192.  The court "may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Velasco v. Gov't of Indon.*, 370 F.3d 392, 398 (4th Cir. 2004); *see also Sharafeldin v. Md. Dept. of Pub. Safety & Corr. Servs.*, 94 F. Supp. 2d 680, 684-85 (D. Md. 2000).  In resolving a factual challenge raised in a motion to dismiss, the court "should apply the standard applicable to a motion for summary judgment …" *Richmond, Fredericksburg & Potomac R.R. v. U.S.*, 945 F.2d 765, 768 (4th Cir. 1991) (internal citations omitted); *see also Parson v. Miles*, No. 17-0708-RBH-KDW, 2018 WL 1477601, at *1 (D.S.C. Mar. 27, 2018).

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes the dismissal of a complaint if it fails to state a claim upon which relief can be granted. The purpose of Rule 12(b)(6) is "to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). The United States Supreme Court's opinions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), "require that complaints in civil actions be alleged with greater specificity than previously was required." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citation omitted). In *Twombly*, the Supreme Court articulated "[t]wo working principles" that courts must employ when ruling on Rule 12(b)(6) motions to dismiss. *Iqbal*, 556 U.S. at 678. First, while a court must accept as true all factual allegations contained in the complaint, legal conclusions drawn from those facts are not afforded such deference. *Id.* (stating that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); *see also Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012) ("Although we are constrained to take the facts in the light most favorable to the plaintiff, we need not accept legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." (internal quotation marks omitted)). Second, a complaint must be dismissed if it does not allege "a plausible claim for relief." *Iqbal*, 556 U.S. at 679.

## ANALYSIS

The Defendants seek dismissal of the City's Complaint on both procedural and substantive grounds. They contend that the City lacks Article III standing because it has not adequately pled damages. In addition, Defendants argue that the economic loss doctrine bars

the City's strict liability and negligence claims.  Defendants also argue that the City failed to state a viable damages claim.  Finally, Defendants assert that the City has failed to state any of its claims for relief.

At this stage of the proceedings, the Defendants' arguments are without merit.  In evaluating the sufficiency of the City's Complaint, this Court is guided by Judge Hollander's comprehensive opinion in *State of Maryland v. Exxon Mobil Corporation, et al.*, denying Exxon's motion to dismiss identical claims asserted by the State of Maryland.  Civ. No. 18-0459-ELH, 2019 WL 4193422 (D. Md. Sept. 4, 2019).  Furthermore, this Court is mindful of the numerous lawsuits filed by major municipalities against Monsanto alleging similar claims based on the environmental and health effects of PCB contamination.  *See, e.g.*, *San Diego Unified Port District and City of San Diego v. Monsanto Co.*, No. 15-cv-578 (S.D. Cal.); *City of San Jose v. Monsanto Co.*, No. 5:15-cv-3178 (N.D. Cal.); *City of Oakland v. Monsanto Co.*, No. 5:15-cv-5152 (N.D. Cal.); *City of Spokane v. Monsanto Co.*, No. 2:15-cv-201 (E.D. Wash.); *City of Berkeley v. Monsanto Co.*, No. 5:16-cv-71 (N.D. Cal.); *City of Seattle v. Monsanto Co.*, No. 16-cv-107 (W.D. Wash.); *City of Long Beach v. Monsanto Co.*, No. 16-cv-3493 (C.D. Cal.); *City of Portland v. Monsanto Co.*, No. 3:16-cv-1418 (D. Or.); *Port of Portland v. Monsanto Co.*, No. 3:17-cv-15 (D. Or.); *City of Chula Vista v. Monsanto Co.*, No. 18-cv-1942 (S.D. Cal.)*; see also State of Washington v. Monsanto Co.*, No. 16-2-29591-6 (Wash. Super.); *State of Oregon v. Monsanto Co.*, No. 18CV00540 (Or. Super.); *State of Ohio v. Monsanto Co.*, No. A1801237 (Ohio Com. Pl.).  Notably, Monsanto has failed to secure a dismissal of any of these actions, some of which remain pending.  *Id.*

I.     **Standing**

Defendants assert that the City lacks standing under Article III of the United States Constitution to bring this action because of the wholly speculative nature of its claimed damages.  To establish Article III standing, a plaintiff must (1) show an injury in fact, (2) demonstrate a causal connection between the defendants' actions and the alleged injury, and (3) show that the injury will likely be redressed by a favorable outcome.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed. 2d 351 (1995).  An injury in fact must be "concrete, particularized, and actual or imminent."  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149, 130 S.Ct. 2743, 177 L.Ed.2d 461 (2010).  "Allegations of *possible* future injury" are not enough to constitute injury-in-fact.  *Clapper v. Amnesty Int'l*, 568 U.S. 398, 409, 133 S.Ct. 1138, 1147, 185 L.Ed.2d 264 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990)).

Defendants argue that the City cannot allege an injury in fact until it has completed a pilot PCB/storm water study.  Defendants rely on this Court's opinion in *Hasley v. Ward Manufacturing, LLC*, where this Court found plaintiffs lacked standing because they asserted only the *threat* of an injury based on the presence of steel tubing products in their homes that *could* be highly dangerous if struck by lightning.  *See* Civil Action No. RDB-13-1607, 2014 WL 3368050, at *3 (D. Md. July 8, 2014).  However, in that case, this Court explained that the speculative nature of the damages that might arise as a result of an "extensive chain of unlikely events" stripped plaintiffs of standing to sue.  *Id.*

In this case, the City has alleged more than a mere threat of injury and its damages are not merely speculative.  Specifically, the City alleges that Baltimore's water systems are currently contaminated with PCBs produced by Monsanto, and that such contamination has

led to unsafe levels of PCB in fish and shellfish in Lake Roland, rendering them unfit for human consumption. (Compl. ¶¶ 20, 85-89, ECF No. 1.) In addition, based on environmental research, the City has alleged that PCB contamination in the Baltimore Harbor likely led to the declining size of its heron colony. (*Id.* ¶ 88.) Finally, the City alleges that it has already incurred costs in taking measures to reduce the volume of PCBs in its storm water, including implementing impervious surface restoration efforts. (*Id.* ¶¶ 19, 89.)

These allegations suffice to plead injury in fact. While the precise extent of the damages is unknown at this point, the City has Article III standing to sue because it has adequately alleged actual, present, and concrete injuries to its storm water system as a result of PCB contamination.

## II.   Economic Loss Doctrine

Defendants also assert that this Court should not permit the City's strict liability and negligence claims because of Maryland's economic loss doctrine. The Court of Appeals of Maryland has delineated three possible types of losses related to products liability: "(1) personal injuries, (2) physical harm to tangible things, and (3) intangible economic loss resulting from the inferior quality of unfitness of the product to serve adequately the purpose for which it was purchased." *A.J. Decoster Co. v. Westinghouse Elec. Corp.*, 333 Md. 245, 634 A.2d 1330, 1332 (Md. 1994). Plaintiffs alleging only the third type, economic loss, are generally barred from bringing their claims under a products liability or any other type of tort theory. *See Nat'l Labor College, Inc. v. Hillier Group Architecture N.J., Inc.*, 739 F. Supp. 2d 821, 832 (D. Md. 2010) ("Under the economic loss rule, courts generally will not permit negligence claims that allege only economic loss."). However, Maryland courts have established a public safety

exception for plaintiffs bringing claims alleging only economic loss.  *See Morris v. Osmose Wood Preserving*, 340 Md. 519, 667 A.2d 624 (Md. 1995).

Defendants argue that the economic loss doctrine bars the City from bringing its strict liability and negligence claims because the City does not allege any injuries to property, and because the City cannot avail itself of the public safety exception.  First, the City has plainly alleged a property interest in the MS4 stormwater system that it owns and operates in a governmental capacity.  (Compl. ¶ 6, ECF No. 1.)  Further, the City has alleged harm to that property interest by the excessive presence of PCBs in the water systems, requiring the City to take measures to reduce the volume of PCBs in its stormwater by implementing impervious surface restoration efforts, among other measures.  (*Id.* ¶¶ 85-89.)  Such allegations have been found sufficient to support a finding of a property interest in similar cases against Monsanto.  *See, e.g., City of San Diego v. Monsanto Company*, Case No. 15cv578-WQH-AGS, 2017 WL 5632052, at *6 (S.D. Cal. Nov. 22, 2017) ("the City alleges sufficient facts to support a reasonable inference that the City has a property interest in its municipal stormwater system and that the municipal stormwater system has been injuriously affected by the presence of PCBs produced by Monsanto"); *see also Transwestern Pipeline Co. v. Monsanto Co.*, 46 Cal. App. 4th 502, 530-31 (1996) (economic loss doctrine did not bar recovery because "the PCBs contaminated the SoCalGas pipelines and the condensate within the pipelines, both of which were the property of SoCalGas").

Contrary to Defendants' assertion, the Maryland Court of Appeals' decision in *Bausch & Lomb, Inc. v. Utica Mutual Insurance Company* does not mandate the application of the economic loss doctrine in this case, where the City alleges not only harm to the City's

14

groundwater, but to the water system that is owned and operated by the City. *See* 330 Md. 758, 625 A.2d 1021 (Md. 1993). The City's property interest in its MS4 storm system is distinct from the State's "interest in groundwater" that "rests on its power to preserve and regulate," which Maryland's Court of Appeals found did "not constitute a property interest within the contemplation of the insurance policy in dispute." *See Bausch & Lomb, Inc.*, 625 A.2d at 1036.

Even if the City's harm alleged was purely economic, the City has sufficiently pled that the public safety exception would apply to preclude the application of the economic loss doctrine. To determine whether the public safety exception applies, Maryland courts examine "the nature of the damage threatened and the probability of damage occurring to determine whether the two, viewed together, exhibit a clear, serious, and unreasonable risk of death or personal injury." *Morris*, 340 Md. at 533, 667 A.2d at 631-32. The "mere possibilit[y]" of injuries is not "legally sufficient" to sustain an action in tort, and the doctrine creates a limited exception meant to apply only in extraordinary circumstances. *See id.* Conditions that present "merely a risk to general health, welfare, or comfort but fall short of presenting a clear danger of death or personal injury will not suffice." *In re Lone Star Industries, Inc., Concrete R. R. Cross Ties Litig.*, 776 F. Supp. 206, 222 (D. Md. 1991) (citing *Council of Co-Owners Atlantis Condo., Inc. v. Whiting-Turner Contracting Co.*, 308 Md. 18, 35, 517 A.2d 336 (1986)).

At this early stage, this Court is satisfied that the City has sufficiently alleged a "real probability that damage or harm [will] occur" as a result of the PCB contamination in its waters. *See Nat'l Labor College, Inc. v. Hilelr Group Architecture New Jersey, Inc.*, 739 F. Supp. 2d 821, 833-34 (D. Md. 2010) (citing *Morris*, 340 Md. at 536). The City has alleged that such contamination has already occurred, and that the City's waters contain fish that are unsafe for

human consumption because of their high levels of PCBs.  (Compl. ¶¶ 20, 85-89, ECF No. 1.)  Even more concerning are the City's allegations of the dangerous effects of PCB in animals and humans alike, including the EPA's determination that PCBs are probable human carcinogens, and that PCBs are associated with serious non-cancer health effects on the immune system, reproductive system, nervous system, and endocrine system.  (*Id.* ¶¶ 40-42.) The City cites human and animal studies that show PCB exposure leading to decreased birth weight, decrease in gestational age, reduced sperm counts, deficits in neurological development affecting visual recognition, short-term memory, and learning, and decreased thyroid hormone levels resulting in developmental deficits such as hearing.  (*Id.* ¶¶ 43-48.)  Studies have also shown that PCBs are also toxic to aquatic species and wildlife, with exposure resulting in death, compromised immune system function, adverse effects on reproduction, development, and endocrine functions.  (*Id.* ¶ 49.)  These allegations suffice to allege that PCB contamination constitutes a clear danger of death or personal injury.

Accordingly, at this stage, the Court finds that the economic loss doctrine does not apply to preclude the City from bringing its strict liability or negligence claims.  However, even if the economic loss doctrine does apply, the City has sufficiently alleged that the public safety exception allows the City to bring its claims for strict liability and negligence.

### III.    Damages Claim

Defendants maintain that the City's damages claim fails because the relief it seeks in obtaining a system upgrade is not a permissible form of relief.  Defendants assert that the City does not claim a proper measure of compensatory damages because its claim only "consists of future costs to test for PCBs, devise a plan, and implement an upgrade to its stormwater

system." (Defs.' Mot. at 27, ECF No. 29-1.)  As this Court has long held, "the plaintiff has the burden of proving the fact of and the extent of the damages he has sustained.  Those damages must be proved with reasonable certainty, and may not be based on speculation or conjecture." *Kirby v. Chrysler Corp.*, 554 F. Supp. 743, 752 (D. Md. 1982).  The City seeks "[d]amages according to proof," "[p]unitive or exemplary damages," and "present and future costs to abate the ongoing public nuisance and/or to investigate, assess, analyze, monitor or remediate the contamination," in addition to declaratory and injunctive relief.  (Compl. at Prayer for Relief, ECF No. 1.)  Clearly, the City is not only seeking an upgrade to its storm water system.

In any event, whatever Defendants may argue is the proper measure of damages in this case, the Court is satisfied that the City has properly pled damages at this stage.  It is simply premature to rule upon the issue of damages in the context of a motion to dismiss as there has been no discovery or development of a record in this case.  *See Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) ("the purpose of Rule 12(b)(6) is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.").

## IV.     Public Nuisance (Count I)

Defendants assert that the City's public nuisance claim must fail because the City lacks standing and because the City has not pled that Monsanto had actual control over the alleged nuisance.

### A.  The City has sufficiently pled standing over its water bodies.

The thrust of Defendants' public nuisance standing argument is that the City has no ownership or proprietary interest in the water bodies and that the City has not alleged any special harm.  Defendants recognize that a public official or public agency authorized to represent the State or a political subdivision may have standing to sue for public nuisance under Maryland law.  (Defs.' Mot at 9, ECF No. 29-1 (citing *Ray v. Mayor and City Council of Baltimore*, 59 A.3d 545, 549, 557 (Md. 2013; Rest. (2d) Torts § 821C (2d 1979)).)  This capacity requires authority over the property that is subject to the nuisance.  *Adams v. Commissioners of Trappe*, 102 A.2d 830, 834 (Md. 1954).  The City has provided its City Charter, adopted pursuant to the Constitution of Maryland, which adequately alleges its authority over its waters.  (Baltimore City Charter, ECF No. 50-1.)[2]  Specifically, the Charter grants the City "full power and authority" to "prevent any material, refuse or matter of any kind from being … deposited in or placed where the same may fall, or be washed into [the Patapsco] river or tributaries."  (*Id.* at Article II, § 10.)  The Charter also grants the City "full power and authority" to "provide for the preservation of the health of all persons within the City … and to prevent and remove nuisances."  (*Id.* at Article II, § 11(a).)

Defendants' attempt to parse the City's authority over the stormwater "within the limits of Baltimore City" and its apparent lack of authority over the water quality of the surrounding water bodies is a distinction with no difference at this procedural stage.  The City alleges its legislative responsibility for the maintenance and operation of municipal stormwater and other water systems and waterbodies to benefit the public health and promote the welfare of its

---

[2] A court may take judicial notice of public records without converting a motion to dismiss into a motion for summary judgment.  *See, e.g.*, Fed. R. Evid. 201; *Tellabs. Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Philips v. Pitt County Memorial Hospital*, 472 F.3d 176, 180 (4th Cir. 2009).

public.  (Compl. ¶ 91, ECF No. 1.)   Indeed, the City's National Pollutant Discharge Elimination System permit requires the City to "take all reasonable steps to minimize or prevent the contamination or other alteration of the physical, chemical, or biological properties of *any* waters of the State."  (NPDES Permit at 16, ECF No. 29-3.)  This Court is satisfied that the City has alleged its authority over all of its waters.

As to whether the City must allege a special harm, the City argues that it need not allege a special harm because such requirement is only for "individual action" and not actions brought by governmental plaintiffs.  (Pl.'s Opp'n at 17, ECF No. 50. (citing Rest. (2d) Torts § 821C(1).)  The Restatement (Second) of Torts provides that "a public official or public agency" that "represent[s] the state or a political subdivision in the matter" need not show special harm. Rest. (2d) Torts § 821C(1); *Ray v. Mayor and City Council of Baltimore*, 59 A.3d 545, 557 (Md. 2013) (applying Rest. (2d) Torts § 821C).  Accordingly, the City, bringing this suit in its governmental capacity, need not allege the special harm that is required for a private individual bringing a public nuisance claim.  *See id.*

Even if the City was required to show special harm, it has done so.  The City alleges that it "suffered harm of a kind different from that suffered by members of the general public, namely the costly damage to its stormwater system and waters which it constructs and/or maintains for the public welfare."  (Compl. ¶ 108, ECF No 1.)  The City also alleges it has already incurred costs as a result of implementing impervious surface restoration efforts.  (*Id.* ¶¶ 6, 89, 104.)  These allegations suffice to allege standing to bring a public nuisance claim at this stage.  *See Adams*, 193 F.R.D. at 256-57 (denying motion to dismiss public nuisance claim

because "plaintiffs have allegedly suffered special and particular damage different in kind from

that experienced in common with other citizens").

### B. The City has sufficiently pled public nuisance.

"A public nuisance is an unreasonable interference with a right common to the general

public." *Tadjer v. Montgomery*, 300 Md. 539, 552-53, 479 A.2d 1321, 1327 (1984) (quoting

Restatement of Torts (Second), § 821B(1) (1979)); *State v. Exxon Mobil Corp.*, 406 F. Supp. 3d

420, 467 (D. Md. 2019).  Section 821B of the Restatement provides:

> Circumstances that may sustain a holding that an interference with a public right is
> unreasonable include the following:
>
> > (a) whether the conduct involves a significant interference with the public
> > health, the public safety, the public peace, the public comfort or the public
> > convenience, or
> > (b) whether the conduct is proscribed by a statute, ordinance or administrative
> > regulation, or
> > (c) whether the conduct is of a continuing nature or has produced a permanent
> > or long-lasting effect, and, as the actor knows or has reason to know, has a
> > significant effect upon the public right.

Widespread water pollution is a public nuisance.  *Exxon*, 406 F. Supp. 3d at 467 (citing *Rhode*

*Island v. Atl. Richfield Co.*, 357 F. Supp. 3d 129, 142 (D.R.I. 2018); Restatement § 832; *New York*

*v. Shore Realty Corp.*, 759 F.2d 1032, 1051 (2d Cir. 1985)).

Despite Defendants' assertion that the City has failed to plead Monsanto's control over

the alleged nuisance, control is not a required element to plead public nuisance under Maryland

law.  In the recent opinion in *Exxon*, Judge Hollander distinguished the case upon which

Defendants principally rely, *Cofield v. Lead Indus. Ass'n, Inc.*, No. MJG-99-3277, 2000 WL

34292671 (D. Md. Aug. 17, 2000).  Judge Hollander explained that "Maryland courts have

never adopted the 'exclusive control' rule for public nuisance liability outlined by the court in

*Cofield.*" 406 F. Supp. 3d at 468. Instead, "Maryland courts have found that a defendant who created or substantially participated in the creation of the nuisance may be held liable even though he (or it) no longer has control over the nuisance-causing instrumentality." *Id.* (citing *Adams v. NVR Homes, Inc.*, 193 F.R.D. 243, 256-57 (D. Md. 2000); *E. Coast Freight Lines v. Consol. Gas. Elec. Light & Power Co. of Balt.*, 187 Md. 385, 397-98, 50 A.2d 246, 252 (1946); *Gorman v. Sabo*, 210 Md. 155, 161, 122 A.2d 475, 478 (1956); *Maenner v. Carroll*, 46 Md. 193, 215 (1877)).

The City has sufficiently alleged that Defendants created or substantially participated in the creation of PCBs, even though Defendants may not have maintained control over the contaminants once disseminated in the City's waters. The City has alleged that Monsanto manufactured, distributed, marketed, and promoted PCBs, resulting in the creation of a public nuisance that is harmful to health and obstructs the free use of the City's stormwater and other water systems and waters. (Compl. ¶ 92, ECF No. 1.) The City further alleges that Monsanto had extensive knowledge about PCB's harmful effects (*id.* ¶¶ 50-76); intentionally withheld this information and misrepresented to the public and government officials that PCBs were safe (*id.* ¶¶ 77-84); and manufactured and distributed PCBs in Baltimore's waters, causing harm to the City's humans, animals, and environment (*id.* ¶¶ 3, 90-109).

Just as the plaintiffs in *Exxon* plausibly alleged that defendants manufactured and distributed the toxic chemicals at issue which substantially contributed to the creation of a public nuisance, so too has the City plausibly alleged that Defendants manufactured and distributed PCBs which have contaminated the City's waters, creating a public nuisance. *See* 406 F. Supp. 3d at 469.

## V.        Strict Product Liability – Defective Design and Manufacture (Count II)

Defendants argue that the City has failed to plead strict liability of defective design and manufacture because the claim is a "categorical" product liability claim barred by Maryland law under the risk-utility test and because Baltimore is a "remote bystander" to whom no duty is owed.  Again, Judge Hollander's opinion in *Exxon* is instructive.  406 F. Supp. 3d 420 (2019).

Maryland has adopted the theory of strict liability for product liability, as set forth in the Restatement (Second) of Torts § 402A.  *Exxon*, 406 F. Supp. 3d at 458-59 (citing *Phipps v. Gen. Motors Corp.*, 278 Md. 337, 352, 363 A.2d 955, 963 (1976)).  To succeed in an action for strict product liability in Maryland, a plaintiff must establish: "(1) the product was in defective condition at the time that it left the possession or control of the seller, (2) that it was unreasonably dangerous to the user or consumer, (3) that the defect was a cause of the injuries, and (4) that the product was expected to and did reach the consumer without substantial change in its condition."  *Id.* (quoting *Phipps*, 278 Md. at 344, 363 A.2d at 958).  Maryland courts apply either the consumer expectation test or the risk-utility test to determine whether a product is "defective and unreasonably dangerous, for strict liability purposes."  *Id.* at 460 (quoting *Halliday v. Sturm, Ruger & Co.*, 368 Md. 186, 193, 792 A.2d 1145, 1150 (2002)).

Under the consumer expectation test, a "defective condition" is a "condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him," and an "unreasonably dangerous product" is one that is "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it with the ordinary knowledge common to the community as to its characteristics."  *Halliday*, 368 Md. at 193, 792 A.2d 1150.  Under the risk-utility test, a product is defective "if the danger presented by the

22

product outweighs its utility." *Halliday*, 368 Md. at 194, 792 A.2d at 1150.  As Judge Hollander

noted in *Exxon*, Maryland courts apply the risk-utility test "only when the product at issue

'malfunctions in some way.'" 406 F. Supp. 3d at 461 (quoting *Halliday*, 368 Md. at 200, 792

A.2d at 1153).  As with the allegations over the toxic chemicals at issue in *Exxon*, the allegations

of PCB contamination in this case are not that the PCBs malfunctioned, but rather that the

PCBs were defective and unreasonably dangerous when used in their ordinary and intended

way.  *See* 406 F. Supp. 3d at 461; (Compl. ¶¶ 110-126, ECF No. 1.)  Accordingly, the consumer

expectation test applies in this case and Defendants' arguments under the risk-utility standard

are unavailing.

        Under the consumer expectation test, the City has plausibly alleged that Monsanto

defectively designed and manufactured PCBs from 1935 to 1977 and that it was foreseeable

to Monsanto that PCBs would contaminate the environment in a widespread manner, reaching

the City's stormwater systems, waterways, and waterbodies.  (Compl. ¶¶ 112-123, ECF No. 1.)

Defendants argue that the City cannot recover under this theory because it was only a

bystander and not a "user" or "consumer" of PCBs.  Contrary to this assertion, "Maryland

courts have never limited recovery in strict liability for design defect to ultimate users of the

product." *Exxon*, 406 F. Supp. 3d at 461.  In *Exxon*, Judge Hollander noted that "the majority

of courts that have addressed the issue have allowed bystanders to recover in strict liability

against sellers for foreseeable injuries caused by defective products."  *Id.* at 462 (citing *Berrier*

*v. Simplicity Mfg., Inc.*, 563 F.3d 38, 54 & n.25 (3d Cir. 2009); *Haumersen v. Ford Motor Co.*, 257

N.W.2d 7, 16 (Iowa 1977); *Embs v. Pepsi-Cola Bottling Co.*, 528 S.W.2d 703, 706 (Ky. 1975);

*Howes v. Hansen*, 56 Wis.2d 247, 201 N.W.2d 825, 831-32 (1972)).  Moreover, the Court noted

that allowing such claims is supported by policy considerations because it "places the risk of harm on the entity most capable of controlling the risk." *Id.*

In this case, the City has adequately pled that PCB contamination in the nation's waters was a foreseeable risk of Defendants' design, manufacture, and distribution of PCBs. The City alleges that "Monsanto's PCBs were unsafe as designed as demonstrated by the United States Congress banning the production and sale of PCBs," and that "[d]ue to their toxicity and inability to be contained, Monsanto knew its PCBs were not safe at the time the product was manufactured because it knew that the product, even when used as intended, would become a global contaminant and cause toxic contamination of waterways and wildlife, such as the City's stormwater system… ." (Compl. ¶¶ 114, 115.)  These allegations suffice to state a claim for design defect. *See Exxon*, 406 F. Supp. 3d at 462.

## VI.    Strict Product Liability – Failure to Warn (Count III)

Defendants also argue that the City's strict liability failure to warn claim fails because Defendants owed no duty to warn the City of the danger of PCBs. A seller of a product has a duty to warn of its dangers "if the item produced has an inherent and hidden danger that the producer knows or should know could be a substantial factor in causing an injury." *Shreve v. Sears, Roebuck & Co.*, 166 F. Supp. 2d 378, 413 (D. Md. 2001) (quoting *Virgil v. Kash n' Karry Serv. Corp.*, 61 Md. App. 23, 484 A.2d 652, 657 (1984)). "Whether there is a duty to warn and the adequacy of warnings given must be evaluated in connection with the knowledge and expertise of those who may reasonably be expected to use or otherwise come into contact with the product…." *Emory v. McDonnell Douglas Corp.*, 148 F.3d 347, 350 (4th Cir. 1998)

(quoting *Mazda Motor of Am., Inc. v. Rogowski*, 105 Md. App. 318, 327, 659 A.2d 391, 395 (1995)).

As was explained in *Exxon*, "there is no duty to 'warn the world,'" but the duty does extend "to third persons whom the supplier should expect to be endangered by its use." 406 F. Supp. 3d at 463. Consequently, Judge Hollander found that Exxon "had a duty to warn the State of dangers associated with MTBE because they created and controlled a market for products in the State that posed unique, substantial harms to its resources." *Id.* Similarly, here, the City alleges that the Defendants, as the sole manufacturer of PCBs, knew and expected that PCBs would cause widespread water contamination and failed to provide any warnings to the public. (Compl. ¶¶ 129-143.) Accordingly, the City has sufficiently pled a claim for strict product liability of failure to warn based on Defendants' duty to warn the general public, whom they allegedly knew and expected would be endangered by PCBs. *See* 406 F. Supp. 3d at 463.

## VII.  Trespass (Count IV)

Defendants assert that the City cannot state a claim for trespass because Defendants lacked control over the PCBs that caused the trespass. A trespass occurs "when a defendant interferes with a plaintiff's interest in the exclusive possession of the land by entering or causing something to enter the land." *Exxon Mobil Corp. v. Albright*, 433 Md. 303, 408, 71 A.3d 30, 94 (2013) (*quoting Rosenblatt v. Exxon Co., U.S.A.*, 335 Md. 58, 642 A.2d 180 (1994)). Here, again, the decision in *Exxon* is useful. In analyzing the State's assertion of a trespass claim based on the widespread contamination of its waters, Judge Hollander determined that the State was proceeding in "its *parens patriae* capacity," representing all of its citizens. 406 F. Supp.

3d at 470.  Accordingly, this Court found that the State plausibly alleged a claim for trespass to the extent it is based on properties within its exclusive possession, but not "to the extent that it is based on properties outside of its exclusive possession—*i.e.*, its natural waters and the properties of its citizens." *Id.*

Here, too, the City is proceeding in its *parens patriae* capacity.  Yet the concern over the extent of the trespass in *Exxon* is inapplicable here, where the City specifically alleges trespass only to "the City's public water systems, which the City operates and maintains for the public welfare," and which "suffer contamination with toxic PCBs."  (Compl. ¶ 147, ECF No. 1.) Accordingly, the City has sufficiently alleged a cause of action for trespass.  *See Exxon*, 406 F. Supp. 3d at 471.

## VIII.  Negligence (Count V)

Defendants recycle the same argument they asserted under strict liability to argue that the City's negligence claim must fail because Defendants owed no duty to the City. To sustain a cause of action for negligence in this context, the City must allege: "(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty." *Gourdine v. Crews*, 405 Md. 722, 738, 955 A.2d 769, 779 (Md. 2008).

This Court has already determined, *supra*, Section VI, that the City has sufficiently pled Defendants' duty to warn the City and the public of the dangers of PCBs.  The City has also sufficiently alleged Defendants' breach in failing to warn of the dangers, and that the City suffered actual harm to the City's waters and water systems as a result of Defendants' failure

to warn of the dangers of PCBs.  (Compl. ¶¶ 154-164.)  Consequently, the City has sufficiently alleged a cause of action for negligence.

## IX.   Continuing Harm Doctrine

In all of its Counts, the City alleges that Monsanto is "under a continuing duty to act to correct and remediate the injuries its conduct has introduced, and to warn the City, its customers, and the public about the human and environmental risks posed by its PCBs." (Compl. ¶¶ 107, 125, 142, 152, 162, ECF No. 1.)   "[T]he 'continuing harm' or 'continuing violation' doctrine … tolls the statute of limitations in cases where there are continuing violations."  *Litz v. Maryland Dep't of Env't*, 76 A.3d 1076, 1089 (Md. 2013) (quoting *MacBride v. Pishvaian*, 937 A.2d 233, 240 (Md. 2007), *abrogated in part by Litz*, 76 A.2d 3d 1076).  Under the continuing harm doctrine, "each new repetition of the wrong creates further liability … and a new statute of limitations begins to run after each wrong perpetuated."  *SPS Ltd. P'ship, LLLP v. Sparrows Point, LLC*, 122 F. Supp. 3d 239, 245 (D. Md. 2015) (citing *Litz*, 76 A.3d at 1089).

As the City concedes, the continuing harm doctrine does not apply here where the City's claims are not subject to the statute of limitations.  (Pl.'s Opp'n at 25 n.22, 27 n.23, ECF No. 50.)   Political subdivisions of the State, such as the City, are exempt from statutes of limitations in actions "aris[ing] out of a strictly governmental function."  *Goldberg. v. Howard Co. Welfare Bd.*, 260 Md. 351, 356, 272 A.2d 397, 400-401 (Md. 1971).  Accordingly, the Court need not address the continuing harm doctrine.  *See City of Seattle v. Monsanto Co.*, 237 F. Supp. 3d 1096, 1105 n.10 (W.D. Wash. 2017) (finding that the court "need not reach Seattle's argument that its nuisance, products liability, and negligence claims result from a 'continuing

27

tort' that tolls the claims' respective limitations periods" because the claims were brought in Seattle's governmental capacity and the statute of limitations did not apply).

## CONCLUSION

For the reasons stated above, Defendants' Motion to Dismiss (ECF No. 29) is DENIED.

A separate Order follows.

Dated: March 31, 2020

\_\_\_\_/s/_____
Richard D. Bennett
United States District Judge